IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PREMIER ELECTRONICS, L.L.C., § | | |
|     *Plaintiff* § | | |
| § | | |
| v. § | | CASE NO. 3:18-CV-2036-S |
| § | | |
| ADT, L.L.C., § | | |
|     *Defendant* § | | |

## PLAINTIFF'S TRIAL WITNESS LIST

Pursuant to the Agreed Scheduling Order [Doc 18], Premier Electronics, L.L.C. ("Premier") files its Trial Witness List:

Shawn P. Griffith (**probable / expert**)
Premier Electronics, L.L.C.
1343 Columbia, Ste. 405
Richardson, TX 75081
(972) 245-8558

Mr. Griffith is expected to testify regarding the development of the bulk-billing security business model implemented by Premier at Phillips Creek Ranch and Light Farms, Premier's business dealings with Republic Property Group, its relationships with its customers at Phillips Creek Ranch and Light Farms, its relationship with the HOA at Phillips Creek Ranch, the effect of ADT's tortious interference on Premier's ability to provide services to its customers, and how such interference has damaged Premier. Mr. Griffith is also expected to testify as to his expert opinions as disclosed in this matter concerning the industry standards and customary practices of the home security industry and the value of residential alarm contracts in that industry.

Mr. Griffith will testify that he is the founder, president, and chief executive officer of Premier. He was previously the founder, president, and chief executive officer of Powell Protection Systems, Inc. ("Powell") which was a predecessor to Premier. He personally manages the day-to-day business of Premier, and formerly managed the day-to-day business of Powell.

Mr. Griffith will testify that Premier is engaged in the business of installing, maintaining, and monitoring fire, burglary, and alarm systems in the State of Texas. Powell was also in the business of installing, maintaining, and monitoring fire, burglary, and alarm systems, as well as low-voltage integration in the State of Texas. He formed Powell in September 1993, and continuously operated it until he formed Premier. Before that, he was employed by Westinghouse Security Systems ("Westinghouse"), one of the largest and most widely recognized security companies in the world. He left Westinghouse to form Powell, which quickly became one of the leading home security and integration services in the North Texas

area. With more than thirty years of experience in the home security and integration industry, he am thoroughly familiar with security industry customs and practices.

Mr. Griffith will testify that Republic Property Group ("Republic") is a real estate development group which owns and develops residential communities in the North Texas area. In 2011 and 2012, Mr. Griffith met with John Wagner, Mark Wagner, Rick Strauss, and Tony Ruggeri of Republic concerning a pioneering new business model in the home security industry sometimes referred to as the bulk-billing model. In this model, the home security company contracts with developers and homeowners' associations to capture the market in master-planned communities before any residential construction begins. After his initial conversations with Republic, most of the subsequent communications he had with Republic were with Tony Ruggeri.

Mr. Griffith will testify that, over the course of a year he and Republic shared information and did market research together concerning using a bulk-billing model for home security services in connection with three master-planned residential communities in the DFW area which were being developed by Republic. Ultimately, Republic delivered to Mr. Griffith a formal Request for Proposal for an agreement to install, monitor, and service security systems in an entire residential community called Phillips Creek Ranch ("PCR") consisting of 2,300 single family homes and 600 townhomes with a guaranteed penetration rate of 100% of homes in the community.

As stated in the Request for Proposal, Republic represented to Mr. Griffith that it was in the process of developing an additional master-planned community in the DFW area which, at build-out, would include over 10,000 homes. Republic represented to Mr. Griffith that it intended to enter into similar agreements with the same security partner for both of these communities, and others in the future for many additional homes that were not yet under contract and was seeking a proposal with prices and terms predicated upon an minimum volume of 6,000 homes and a very high likelihood of any additional new Republic developments in the future, adding additional volume. These other "future" communities are mentioned in the attached Request for Proposal.

In response to the Request for Proposal, Mr. Griffith made a Security Proposal to Tony Ruggeri and Jake Wagner with Republic. Part of his proposal was offering additional services to individual homeowners, including cellular alarm transmission service for $15 per month, as well as a variety of other additional services.

Mr. Griffith will testify that, effective September 4, 2012, Premier, the Developer, and the Association entered into a written Security System Agreement (the "Agreement") implementing the bulk-billing model. It was one of the first bulk-billing agreements of this kind anywhere. Mr. Griffith will testify that, because the bulk-billing model was no new, there is no standard form contract in the security industry for such an agreement. Republic provided to him the initial draft of the Agreement, which was a similar agreement concerning another master-planned community known as Lantana which was also owned by Republic. The parties made some changes to that initial draft to customize it for PCR and the above parties.

Mr. Griffith will testify that he specifically formed Premier as a separate company from Powell to provide services under the Agreement and other similar bulk-billing agreements. Accordingly, Premier is named as a party to the Agreement. Likewise, instead of Republic, PCR Land Company, L.L.C. (the "Developer") signed the Agreement because it is the Republic-affiliated development company that developed PCR. PCR Community Association, Inc. (the "Association") is also a party to the Agreement as the homeowners' association formed by the Developer to be ultimately be owned and managed by individual homeowners of residences (the "Residences") located in PCR. It was contemplated that similar bulk-billing agreements would be drafted and signed with respect to other Republic master-planned communities in the DFW area, including the Light Farms and Walsh communities, to be signed by the homeowners' associations created by Republic for those communities and by the community-specific development company formed by Republic to develop each of those communities. Mr. Griffith will testify that he subsequently entered into a very similar bulk-billing agreement for the second Republic development known as Light Farms on behalf of Premier.

Mr. Griffith will testify that, pursuant to the Agreement, Premier agreed to provide alarm monitoring services as described in the Agreement for all Residences located within PCR. Premier agreed to provide alarm monitoring services for each Residence in the Development at a substantially discounted price based upon the volume of homes Republic had represented to Premier would ultimately be included in the planned business relationship for its two newest communities and, in all likelihood, similar opportunities for planned upcoming future communities. This discounted price is about half of the price that was charged by Powell for similar services, and about half of the price customarily charged for such services in the DFW area.

Mr. Griffith will testify that, pursuant to the Agreement, Premier agreed to install security systems in all Residences located within the Development if requested by the company constructing the Residences (the "Homebuilder") at a cost of $700.00 per Residence to be paid by the Homebuilder. The Agreement includes specifications for such Systems as well as a limited warranty as further described in the Agreement. If a Homebuilder did not request Premier to install the System in a particular Residence, Premier could require the Homebuilder to correct any deficiencies in the System installed prior to providing any monitoring services.

Mr. Griffith will testify that, under the Texas Private Security Act, only companies licensed under the Act can provide alarm monitoring services to customers. Premier is licensed to provide such services to customers in Texas. Section 1702.288 of the Texas Private Security Act requires a home security company which provides alarm system services to enter a separate written contract with each client. Therefore, pursuant to the Agreement, the owner(s) of each residence (the "Homeowners") would enter into a separate Security Monitoring Agreement (the "Monitoring Agreements") with Premier upon completion of the Residence when the security system was first activated.

Mr. Griffith will testify that, for an Initial Term of thirty-six months beginning after the date of the tenth system activation for an included Residence, the Association agreed to a bulk billing arrangement pursuant to which the Association would collect Premier's charges for its alarm monitoring service as part of the HOA dues for each Residence. Pursuant to the Agreement,

Premier would invoice the Association, rather than individual Homeowners, for the monthly service fee, and the Association would remit payment to Premier. Under the bulk-billing business model, the amount of HOA dues is calculated to include this charge.

Mr. Griffith will testify that this term was a significant and material part of the parties' agreement to secure the pricing agreed to by Premier. Along with the promised volume, this bulk billing arrangement allowed Premier to provide its monitoring services to PCR Homeowners at approximately half price. The tenth system activation occurred on July 18, 2013, at the PCR residence located at 6318 Chimney Peak.

Mr. Griffith will testify that, pursuant to the Agreement, the term of the Agreement automatically renewed for successive thirty-six-month renewal terms after the expiration of the initial term, unless terminated by the Association by written notice delivered sixty days prior to the commencement of any renewal term. It was always contemplated that the Agreement would continue through build-out of the Development. The Request for Proposal specifically provides: "The penetration rate in the community is guaranteed at 100% of homes." This automatic renewal term ensured Premier that it would reach the represented volume of 2,300 homes justifying its deep discounts.

Mr. Griffith personally discussed the automatic renewal term with Tony Ruggeri of Republic. He indicated that during build-out of the Development, the Republic-affiliated Developer would maintain control over the Association but, after build-out, the management and control of the Association would be turned over to the Homeowners. If the Homeowners ever decided to not renew the bulk-billing agreement for any reason, Tony Ruggeri represented, and Mr. Griffith agreed, that under the Agreement, Premier would still have 2,300 customer accounts.

Mr. Griffith will testify that the Agreement permits Premier to terminate the Agreement at any time upon ninety days written notice to the Association. Premier never elected to terminate the Agreement and, therefore, retained all of its right, title, and interest to the Systems.

Mr. Griffith will testify that the Agreement states that if Premier files for bankruptcy, becomes insolvent, or defaults, all of Premier's right, title, and interest to the Systems would pass to the Association. Premier has never filed for bankruptcy, is not insolvent and has fulfilled all of its obligations in accordance with the Agreement.

Mr. Griffith will testify that the Agreement permits Premier to sell its interest, but only if it sells substantially all of its assets. Mr. Griffith will testify that he became aware that ADT had become interested in the bulk-billing business model, and acquired a competitor known as DevCon. Mr. Griffith had discussions with Jack Teal of ADT regarding a potential sale of its assets, including its bulk-billing agreements for PCR and Light Farms; however, there was never an offer from ADT to purchase Premier's interest or its assets. Other than these dicussions with Mr. Teal, Premier did not sell, and had no intention of or plans to sell, any of its interests or assets.

Mr. Griffith will testify that Section 9 of the Agreement requires the Association to give Premier written notice of any alleged material breach of the Agreement and an opportunity to cure any

such breach as a prerequisite to exercising any right or remedy the Association may have, including the right to prematurely cancel the Agreement. Premier received no such written notice from Association. Neither the Association nor the Developer has ever claimed that Premier committed a material breach of the Agreement.

Mr. Griffith will testify that Section 9 also provides that the involuntary transfer of Premier's interest in the Agreement constitutes a default by Premier. No such involuntary transfer ever occurred.

Mr. Griffith will testify that Section 9 further provides that the persistent and pervasive failure of Premier to provide the services described in the Agreement in a commercially reasonable manner constitutes a default of the Agreement. Premier consistently provided the services described in the Agreement in a commercially reasonable manner. Accordingly, neither the Association nor the Developer ever gave Premier written notice alleging that Premier had failed to provide the services described in the Agreement in a commercially reasonable manner. Moreover, the existence of any default under that provision is an item that expressly must be submitted to arbitration as required by the agreement. Neither the Association nor the Developer ever sent a request or demand for arbitration alleging that Premier had failed to provide the services described in the Agreement in a commercially reasonable manner.

Mr. Griffith will testify that this particular business model with pre-designed system specifications mandated by the developer to the builder, a low initial installation fee, and bill collection of alarm monitoring fees by the homeowners' association was all part of a unique business formula he developed and discussed with Republic in confidence. This business formula created a "first to market" advantage for Premier with limitless opportunity for many years during the biggest residential building boom in Texas history.

Mr. Griffith will testify that, as set forth in the Security Proposal, the Agreement expressly permitted Homeowners or Homebuilders to request components and features other than, or in addition to, those specified in the Agreement; however, it further provided that such person would be responsible for the additional cost of the requested modifications installed in the Residences. The Agreement required Premier and each Homeowner to execute a separate Monitoring Agreements which included, among other terms, a provision which reads:

> THE SERVICES PROVIDED BY PREMIER UNDER THE ASSOCIATION AGREEMENT DO NOT INCLUDE FIRE MONITORING SERVICES. ANY FIRE MONITORING, CELULAR MONITORING OR AUTOMATION SERVICES SHALL BE PROVIDED TO THE MONITORED PREMISES ONLY UNDER A SEPARATE WRITTEN AGREEMENT BETWEEN HOMEOWNER AND PREMIER.

Additional components and features could be selected by each Homeowner under terms and pricing negotiated separately between Premier and the Homeowner. The price for these additional components and features were not subject to the bulk billing arrangement with the Association.

Mr. Griffith will testify that, like Powell, Premier provides other custom home theatre, home audio, and similar goods and services to homeowners as part of its business. The relationship gave Premier a competitive advantage in marketing these services to PCR Homeowners again under terms and pricing negotiated separately between Premier and the Homeowner or Homebuilder. In his three decades of experience in this industry, Mr. Griffith observed that many new home buyers postpone installing custom home theatre, home audio, and similar goods and services until a few years after purchasing a home. He observed that they are then very likely to purchase such goods and services from our company because they are already familiar and comfortable with it. Based upon his experience, he has observed that homeowners purchasing homes in the $500k price range like in PCR, on average, will purchase $5,000 per home of such goods and services from our company over the span of their homeownership there.

Mr. Griffith will testify that, after the Agreement was executed, Premier performed all of its obligations under the Agreement. When requested by Homebuilders, Premier installed Systems complying with the specifications set forth in the Agreement, activated its Monitoring Services and Remote Access Services, billed the Association for alarm monitoring services and billed individual Homeowners directly for additional services as specified in the Agreement. Premier fully complied with all warranty and maintenance obligations under the Agreement.

Mr. Griffith will testify that, during the initial term of the Agreement, many if not all, PCR Homeowners requested and received modifications to the Systems prescribed by the Agreement to provide for one or more of the following additional services: fire services, cellular alarm transmission services (as opposed to using a traditional landline), automation, remote access, etc. As required by the Agreement, Premier entered into separate agreements contained within their individual security monitoring agreement with each Homeowner in PCR who requested monitoring services, cellular alarm transmission services or other modifications to the Systems prescribed by the Agreement.

Mr. Griffith will testify that these agreements permitted Homeowners to avoid paying, or to greatly reduce, the upfront cost of installation, and allowed Homeowners to receive a deeply discounted price by agreeing to a specified initial term of service, typically 5 years from the date of activation of the service for each Homeowner. Each of Premier's representatives were trained to discuss with each Homeowner the option of paying upfront for additional services or receiving a discounted price by agreeing to the specified initial term of service. Upon review of Premier's customer files, Mr. Griffith knows that every single Homeowner in PCR who requested cellular alarm transmission service agreed to the specified initial term of service, rather than paying the upfront cost of installation.

Mr. Griffith will testify that every PCR Homeowner who received services from Premier signed a Security Monitoring Agreement which are substantially identical. The typewritten portions of that agreement are common, and the handwritten portions are unique to the individual owner's home. Paragraph 2 e.) of the Security Monitoring Agreement provides:

> Additional services initial term shall be five (5) years starting on the first day of the month during which the Equipment is installed and connected by Premier or its contractor(s). The agreement will automatically continue for successive one-year

      renewal terms unless Customer or Premier gives written notice of cancellation at least 60 days before the initial or renewal term ends.

Mr. Griffith will testify that Republic, the Developer, and the Association were all aware of this language in the Security Monitoring Agreements between Premier and the Homeowners. In drafting the Security Monitoring Agreements, the parties used as a template another security monitoring agreement form with which Republic was also familiar and was already being used in another development known as Lantana. That form included substantially similar language to what is quoted above, including an initial term of five years from the date the individual homeowner's alarm equipment was connected. Republic, the Developer, and the Association all knew that Premier would be essentially adopting a version of that security monitoring agreement form for PCR. It was never an issue between Premier, Republic, the Developer, and the Association at the time because build-out of the PCR Development was far from complete.

Mr. Griffith will testify that this provision of each Homeowner's Security Monitoring Agreement is not in any way affected by the terms of the bulk-billing Agreement with the Developer and the HOA. It ensures that Premier's customer, the individual Homeowner, is the only one authorized to cancel Premier's services. It is a standard industry practice in the alarm and security industry, and a routine practice of Premier, to require each customer who is receiving alarm monitoring services to provide written notice in advance of a desire to cancel service to prevent a third-party from cancelling another person's alarm monitoring service.

Mr. Griffith will testify that Insight is a property management company that was hired by the Developer to manage the Association. Insight was familiar with the Agreement, and the large number of Homeowners who had entered into separate written agreements with Premier for alarm monitoring, cellular alarm transmission services and additional services. He discussed with Bruce Crawford his comment about not having Homeowners sign contracts that exceed the Agreement. They discussed that the Agreement requires Premier to enter into separate Security Monitoring Agreements with the Homeowners and expressly provides that additional services be provided under a separate agreement. They also discussed that a number of Homeowners preferred not to have a landline and were requesting cellular alarm transmission as an additional service. They discussed modifying the Agreement to include cellular alarm transmission service, but the Developer and the Association did not want to modify the Agreement to include that service at that time. They discussed that it would be preposterous that the first client could have a three year agreement and the last could potentially have a one day agreement but pay nothing for the parts or labor for activating the system and Premier would get paid nothing for the service either. They discussed that it would make absolutely no sense.

Mr. Griffith will testify that, by April 2016, 917 homes had been built in PCR which were being monitored by Premier. Of these, 386 homes had cellular alarm transmission and/or other additional services. During those three years, Premier received only a handful of routine complaints from individual Homeowners, which were promptly addressed and corrected.

Mr. Griffith will testify that, on April 21, 2016, he received a letter from Greg Barnett at Insight indicating that the Association was giving written notice of its intent to not renew the Agreement. Upon receipt of the notice, he promptly contacted Bruce Crawford to ask the reason

for the notice as he had no reason to believe that the Developer or the Association were in any way displeased with Premier's performance. Moreover, the terms of the Agreement were premised upon a written proposal from Republic requesting a bid predicated upon a much larger volume of Residences than had been constructed by April 2016. Bruce Crawford assured Mr. Griffith that the notice was simply an attempt to renegotiate certain terms of the Agreement, told him to disregard it, and encouraged him to continue alarm activations for PCR Homeowners whose residences were completing construction at that time. With those assurances, Premier continued to activate service for PCR Homeowners after receipt of the notice as required by the Agreement.

Mr. Griffith will testify that Bruce Crawford subsequently told him that a representative of ADT had contacted Insight and was offering to provide the same services Premier was providing under the same terms as the Agreement and to provide cellular alarm transmission as an included service if the length of the Agreement's automatic renewal terms was extended to ten years instead of three years. Mr. Crawford told him that, if Premier matched those terms, the Association would renew the Agreement with Premier as modified. On May 5, 2016, Mr. Griffith told Bruce Crawford that Premier accepted the proposed modification to the Agreement. The following week, Bruce Crawford called him and told him that the Association had instead signed a contract with ADT on May 6, 2016.

Mr. Griffith will testify that, on May 11, 2016, Greg Barnett of Insight called him demanding that Mr. Griffith give him the lockout code in anticipation of the Association's change in service providers. The control panel, which ADT claims to have replaced on every job, stores key Premier information as well as key customer information. A lockout code protects that information from other security companies so that they can not "slam" or steal clients. It also protects the homeowner from someone accessing their user code and defeating the system. Someone with the lockout code could pretend to be with Premier and give the central station the account number and tell them not to dispatch or to disregard all alarms thereby defeating the system. Mr. Griffith had never had an occasion to discuss a lockout code with anyone affiliated with Insight, the Association, the Developer, or Republic, but the existence and use of a lockout code is something well-known within the security industry. When Mr. Griffith initially refused, Mr. Barnett became very belligerent and began screaming at him and using foul language. He was so flustered by Mr. Crawford's aggressiveness that he ultimately gave them Premier's lockout code.

Mr. Griffith will testify that he subsequently received a community brochure ADT had given to homeowners in PCR, as well as a letter from Greg Barnett to such homeowners. Both items falsely tell homeowners in PCR that ADT must program their system for monitoring by ADT before June 21, 2016, to avoid interruption in service. At no time did Premier ever threaten to cut-off any homeowner's monitoring service. Indeed, Premier continued to install new systems and activate new customers even after receiving the notice of non-renewal. Even with the notice, the initial term of the Agreement would not expire until July 18, 2016. There was never any risk of a service interruption for any existing PCR Homeowner. Premier would have continued to provide the same service to each of its customers unless and until the customer gave written notice of cancellation sixty days before the end of the term of that particular customer's Security Monitoring Agreement.

Mr. Griffith will testify that he also received a letter from Greg Barnett sent on June 3, 2016, which indicates that ADT had converted almost 550 Premier clients in roughly 20 business days, which would have been extremely unlikely, from a technical perspective without the lockout code. Without the lockout code, it would have been necessary to have the control panels in stock, to remove the CPU or control panel that Premier had already installed and programmed, and to install a brand new one—wiring up each one and then program the entire system from factory default versus programming a couple of sections with the lockout code.

Mr. Griffith will testify that neither the Agreement itself nor any of the negotiations leading up to the Agreement contemplated the Association entering into a new bulk-billing agreement with a competitor of Premier. The Agreement does not give either the Developer or the Association any rights whatsoever in or to Premier individual Security Monitoring Agreements with its individual customers who are PCR Homeowners. Likewise, non-renewal of the Agreement by the Association did not terminate Premier's individual Security Monitoring Agreements with the Homeowners—only terminating the Association's obligation to collect the fee for Premier's alarm monitoring service as part of the Homeowners' HOA dues.

Mr. Griffith will testify that, after July 18, 2016, Premier began to invoice its customers who were PCR Homeowners directly because the Association had not renewed the Agreement. He spoke to numerous customers who called Premier to complain about receiving an invoice from Premier. Many told him that what happened to them. Some told him that ADT representatives had told them that they would no longer need to honor the terms of their separate written agreements with Premier for monitoring, cellular alarm transmission services and other modifications to the Systems prescribed by the Agreement. Others told him that ADT representatives had told them it had bought Premier. Still others told him that ADT representatives had told them that Premier had gone out of business.

Mr. Griffith will testify that he personally visited several homes of PCR Homeowners who were customers of Premier who were switched to ADT after the switch had occurred. He observed that Premier's cellular alarm transmission equipment had been removed from those homes, and ADT's equipment had been installed in its place. The cellular alarm dialers used by Premier have a sim card in it specifically authorized to Premier. With the sim card, the dialers provide a simulated dial tone for the alarm panel to transmit signals via a dedicated cellular line, rather than on a landline, to Premier's monitoring station. When a security company sells customer accounts to another company, it will reauthorize the other company to use that dedicated line, similar to when a person "releases" a cellular telephone number to another user. In the security industry, this along with remote call forwarding of the number programmed in the CPU is how a "line swing" is typically done. From a technical perspective, because there was no sale of accounts to ADT, it had to disconnect the cellular alarm dialers from the Homeowners' systems in order to redirect the alarm signal via ADT's dedicated cellular line to its monitoring station.

Mr. Griffith also personally observed that, while the control panels of the Premier's alarm systems had not been removed from those homes, the lockout codes had been reprogrammed. From a technical perspective, the simplest and easiest way to change the lockout code is by using the existing lockout code to program a new lockout code. In the security industry, this is the way a typical service technician changes a lockout code. There are technically feasible ways of

changing the lockout code without knowing the existing code but doing so requires a much more advanced level of knowledge and skill than the average technician has. Without the lockout code, ADT would have had to remove and replace the CPU or control panel that Premier had programmed on each individual Homeowner's system.

Mr. Griffith will testify that the removal of Premier's equipment, installation of ADT's equipment, and changing of Premier's lockout code prevents Premier from providing the alarm monitoring, cellular alarm transmission, automation, remote access, fire protection and other services to Homeowners. From a technical perspective, these actions by ADT prevent Premier from performing services pursuant to the individual Security Monitoring Agreements with PCR Homeowners.

Mr. Griffith will testify that, from May 13, 2016, throughout the summer of 2016, Premier received numerous telephone calls as well as emails and letters from our customers in PCR concerned about the change. As indicated in those written communications, Premier's customers expressed disappointment that such a change was made without consulting them—the members of the Associations. Some, like Mr. Fuchs, indicated that ADT had already reprogrammed their home security system. Some, like Mr. Robertson, were told that arrangements were being made to address their agreements for additional services. Some, like Mr. and Mrs. Yandell, indicated that they were not happy with previous experiences with ADT. Almost of them, like Mr. Bruce, stated that the change was not a result of the service provided by Premier. Indeed, before May 2016, Mr. Griffith had received numerous compliments from our customers at PCR as well as the representatives of the Association, Developer, and Homebuilders at PCR.

Mr. Griffith will testify that, on May 13, 2016, he hired attorney John M. Frick, who at that time was affiliated with the law firm Reid & Dennis, P.C., on behalf of Premier to send letters to both Insight and ADT demanding that they stop interfering with Premier's contracts. Nevertheless, ADT persisted in removing Premier equipment from the Residences, installing their own, and changing the lockout codes. From reports Premier receives from its monitoring station, Mr. Griffith watched as the number of accounts in PCR transmitting signals became smaller and smaller.

Mr. Griffith will testify that the Agreement involving PCR was only one piece of the business relationship between Premier and Republic. The planned business relationship included not only PCR, but also two other communities—Light Farms and Walsh. By 2016, Premier had already entered into a separate agreement concerning the Light Farms development, which automatically renewed in 2017. Based upon Republic's representations to Mr. Griffith, they both expressly contemplated that a third agreement would be entered into concerning a third planned development known as Walsh. Republic's representatives, including Tony Ruggeri, had represented to him that Walsh would ultimately include 17,000 homes at completion, making it the largest master-planned community ever built in the area. Given that Republic-affiliated entities had already entered into agreements with Premier for two of its three new DFW communities, Mr. Griffith certainly perceived that there was a reasonable probability that Premier would have entered into a business relationship with the Republic-affiliated developer and homeowners' association for the Walsh development under similar terms and conditions.

Mr. Griffith will testify that, prior to ADT's actions in PCR during May-July 2016, every communication that he had with Tony Ruggeri and other representatives at Republic concerning the Walsh development indicated that Premier would have a business relationship with the Republic-affiliated developer and homeowners' association for the Walsh development under similar terms and conditions as the agreements for PCR and Light Farms.  Home construction had not begun at the Walsh development at that time.  After ADT's actions in PCR, Mr. Griffith personally communicated with Tony Ruggeri and other representatives at Republic concerning the Walsh development.  Those communications indicated that such a business relationship was no longer likely to occur.  Subsequently, home construction has begun at the Walsh development.  No agreement has been entered into by Premier concerning the Walsh development, although Premier is willing to do so, because Tony Ruggeri and other representatives at Republic will no longer meet with Mr. Griffith to discuss the terms of such an agreement. As a result, Republic has failed to deliver the volume of homes promised in its Request for Proposal to Premier and has began construction at the Walsh development without negotiating or entering a bulk-billing arrangement for alarm monitoring services with Premier.

Mr. Griffith will testify that Premier has a series of individual Security Monitoring Agreements, many of which include additional services, with essentially all, of the PCR Homeowners whose homes were built before July 18, 2016.  Because of the actions of ADT described above, Premier is no longer able to technically provide the services required by the individual Security Monitoring Agreements.  Numerous Premier customers have told him that they did not want to switch but believed they had no choice because they did not want their service to be interrupted as ADT indicated. Premier would not have interrupted service with PCR customers who did not allow ADT to reprogram their equipment.

Mr. Griffith will testify that, as a result of ADT's interference, Premier has lost millions of dollars of lost profits.

Philip Courtney Hogan, CPA (**probable / expert**)
10440 N. Central Ewy., Ste. 980
Dallas, TX 75231
(214) 361-1040

Mr. Hogan is expected to testify as to his expert opinions and impressions as set forth in the reports he prepared and has submitted, including his calculation of the monetary damages caused by ADT's tortious interference.  He will testify as to his knowledge, education, training, and experience, as well as his credentials in the field of forensic accounting.

He will testify that it is his opinion that Premier has sustained damages in the amount of at least $673,570.23 as a result of losing customer accounts at PCR.  He will testify that Premier incurred damages in the amount of $254,477.12, as a result of losing the revenue from its regular residential security monitoring system and service customers for remainder of the existing term of those agreements.  He will testify that Premier incurred damages in the amount of $197,245.37 as a result of losing the revenue from its cellular alarm transmission service customers for remainder of the existing term of those agreements. He will testify that Premier incurred damages in the amount of $124,776.77, as a result of losing the revenue from its regular

residential security monitoring system and service customers for future renewals of those agreements. He will testify that Premier incurred damages in the amount of $97,070.97 as a result of losing the revenue from its cellular alarm transmission service customers for future renewals of those agreements. He will explain to the jury what information he used and how he made such calculations.

Keith Patterson (**possible**)
4943 Cloudcroft
Irving, TX 75061
(682) 300-3322

Mr. Patterson is a former employee of Devcon Security System who is expected to testify as to Devcon's business model which was similar to Premier's bulk-billing model, ADT's interest in and efforts to compete with Devcon, and ADT's eventual acquisition of Devcon for $148.5 million in order to gain a foothold in this new business model in the residential alarm services industry. He is expected to testify that ADT had no successful business in Texas using a bulk-billing model, or similar community-based model, until Phillips Creek Ranch despite its efforts to develop such business.

Jack Teel (**possible**)
80 Bob Jones Ct.
Pottsboro, TX 75076
(972) 358-2661

Mr. Teel is a former Strategic Account Sales Manager and Regional Director for ADT who will testify about ADT's intense interest in Premier's business model, ADT's interest in acquiring Premier's customer accounts a Republic Property Group's master-planned communities in North Texas, and the Non-Circumvention Agreement he signed with Premier on ADT's behalf.

Terry Day (**possible**)
13457 Cottage Grove
Frisco, TX 75034
(214) 636-0596

Mr. Day is a former Premier employee who will testify as to his day-to-day activities working for Premier at the Phillips Creek Ranch community and how ADT's tortious interference affected Premier's ability to perform its contracts with its customers in Phillips Creek Ranch.

Chris Cahill (**possible**)
3728 Bluebonnet Court
Flower Mound, TX
(469) 442-9824

Mr. Cahill is a former Premier employee who will testify as to his day-to-day activities working for Premier at the Phillips Creek Ranch community and how ADT's tortious interference affected Premier's ability to perform its contracts with its customers in Phillips Creek Ranch.

Doug Danley (**possible**)
421 Lonestar Ln.
Hideaway, TX 75771
(214) 566-7454

Mr. Danley is a Premier employee who will testify as to his day-to-day activities working for Premier at the Phillips Creek Ranch community and how ADT's tortious interference affected Premier's ability to perform its contracts with its customers in Phillips Creek Ranch.

Dave Tillotson (**possible**)
3704 Wolf Creek Ln.
Melissa, TX 75454
(972) 838-8645

Mr. Tillotson is a Premier employee who will testify as to his day-to-day activities working for Premier at the Phillips Creek Ranch community and how ADT's tortious interference affected Premier's ability to perform its contracts with its customers in Phillips Creek Ranch.

Ronnie Jones (**possible**)
1204 Clint St.
Carrollton, TX 75006
(214) 779-0359

Mr. Jones is a former Premier employee who will testify as to his day-to-day activities working for Premier at the Phillips Creek Ranch community and how ADT's tortious interference affected Premier's ability to perform its contracts with its customers in Phillips Creek Ranch.

Melissa Dickerson (**possible**)
621 W. Windsor
Denton, TX 76207
(817) 501-7906

Ms. Dickerson is a former Premier employee who may testify as to communications with Premier's customers at Phillips Creek Ranch, how ADT's actions tortiously interfered with Premier's relationships with those customers, and what she saw and heard at a meeting of homeowners at Phillips Creek Ranch attended by ADT representatives.

Amber Turner (**possible**)
Premier Electronics, L.L.C.
1343 Columbia, Ste. 405
Richardson, TX 75081
(972) 245-8558

Ms. Turner may testify as to documents used by Premier in its business and compilations of data.

Patrick Vedra (**possible**)
11363 Altamont Dr.
Frisco, TX 75033
(281) 682-7321

Mr. Vedra is a former employee of Republic Property Group who will testify as to his communications with Premier confirming that Republic's understanding and interpretation of key terms of the Security System Agreements governing the Phillip Creek Ranch and Light Farms master-planned communities matches Premier's understanding and interpretation of those terms.

Wafer Gamil (**possible**)
5399 Randwick
Frisco, TX 75034
(214) 862-4692

Mr. Gamil will testify he owns a home in Phillips Creek Ranch and initially refused to allow ADT to replace the equipment installed in his home despite the efforts by ADT and the HOA to force him to do so because he was already under a contract with Premier. He will testify that homeowners in Phillips Creek Ranch were falsely told that their security alarm monitoring service would be interrupted if they did not allow ADT to reprogram their systems. He will also testify that he was not told by ADT or Insight that he had any choices as alleged by ADT.

    Respectfully submitted,

    */s/ John M. Frick*

    _____

    **John M. Frick**
    Texas Bar No. 07455200
    *jfrick@bennettweston.com*

    **BENNETT, WESTON, LAJONE & TURNER, P.C.**
    1603 LBJ Freeway, Suite 280
    Dallas, Texas  75234
    Tel:     (972) 662-4901
    Fax:    (214) 393-4043

    **ATTORNEY FOR PLAINTIFF**
    **PREMIER ELECTRONICS, L.L.C.**

## CERTIFICATE OF SERVICE

       This is to certify that a true and correct copy of the foregoing Plaintiff Trial Witness List has been furnished to the following counsel in accordance with the Federal Rules of Civil Procedure, this 11th day of January 2021:

| | |
|---|---|
| Eric S. Boos | Tanya L. Chaney |
| SHOOK, HARDY & BACON, L.L.P. | SHOOK, HARDY & BACON, L.L.P. |
| Citigroup Center | JPMorgan Chase Tower |
| 201 S. Biscayne Blvd., Suite 3200 | 600 Travis St., Ste. 3400 |
| Miami, FL  33131-4332 | Houston, TX  77002-2926 |
| esboos@gmail.com | tchaney@shb.com |

                                         */s/ John M. Frick*_____
                                         John M. Frick