IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PREMIER ELECTRONICS, L.L.C., § | | |
|    *Plaintiff* § | | |
| § | | |
| v. § | | CASE NO. 3:18-CV-2036-S |
| § | | |
| ADT, L.L.C., § | | |
|    *Defendant* § | | |

**PLAINTIFF PREMIER'S RESPONSE TO ADT LLC'S MOTION IN LIMINE
TO EXCLUDE UNSUPPORTED TESTIMONY REGARDING A PURPORTED
CONSPIRACY INVOLVING ADT**

Plaintiff Premier Electronics, L.L.C. ("Premier") files this Plaintiff Premier's Response to ADT LLC's Motion in Limine to Exclude Unsupported Testimony regarding a Purported Conspiracy involving ADT.

**I.
INTRODUCTION**

**1.** This case is about a large home security alarm monitoring company—Defendant ADT, L.L.C. ("ADT")—tortiously interfering with a smaller company's customer accounts by lying to those customers and tampering with the smaller company's home security equipment. With the complicity of a property management company, ADT stole these accounts by falsely telling Premier's customers in the Phillips Creek Ranch ("PCR") community:

> **We must program your system for monitoring by ADT before June 21, 2016 to avoid interruption of service.**

Under this fictitious threat of losing their home security service, Premier's PCR customers allowed ADT to remove and to reprogram the security equipment that Premier was using to service its customers, thereby diverting such service to ADT.

## II.
## ARGUMENTS & AUTHORITIES

2.    In Plaintiff's First Amended Complaint, Premier asserts that ADT and Insight Association Management, L.P. ("Insight") are guilty of a civil conspiracy. In Texas, a civil conspiracy is not a tort but is simply a way to extend liability beyond the primary actor to others who agreed to act toward a common goal. *E.g.*, *Carroll v. Timmers Chevrolet, Inc.*, 592, 922, 925-26 (Tex. 1979); *Helping Hands Home Care,, Inc. v. Home Health of Tarranbt Cnty., Inc.*, 393 S.W.3d 492, 506 (Tex. App.—Dallas 2013, pet. denied). Each person in the conspiracy is responsible for the acts of others that were done in furtherance of the common purpose. *Carroll*, 592, S.W.2d at 926; *Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex. 1983). When a conspiracy is proved, the acts and declarations of each conspirator during the conspiracy and in furtherance of the common design are admissible against the other conspirators. *Harang v. Aetna Life Ins.,* 400 S.W.2d 810, 818 (Tex. App.—Houston [1st Dist.] 1966, writ ref'd n.r.e.). Two or more business entities can conspire with one another. *See, e.g.*, *Berry v. Golden Light Coffee Co.*, 327 S.W.2d 436, 440 (Tex. 1959). Third parties can be liable for conspiracy to tortiously interfere. *See, e.g.*, *Raymond v. Yarrington*, 73 S.W. 800, 803 (Tex. 1903).

3.    A conspiracy may be, and usually is, established by circumstantial evidence. *Chu v. Hong*, 249 S.W.3d 441, 447 (Tex. 2008); *Schlumberger Well Surv. Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968); *see, e.g., Wackman v. Rubsamen*, 602 F.3d 391, 409 (5th Cir. 2010). Conspiracy liability generally can be established by proof showing concert of action or other circumstances from which a natural inference arises that the unlawful overt acts were committed in furtherance of a common design, intention, or purpose of the conspirators. *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.3d 567, 581 (Tex. 1963); *Paschal v. Great W. Drilling, Ltd.*, 215 S.W.3d 437, 453 (Tex. App.—Eastland 2006, pet. denied). It is not necessary

to show that every act of a conspirator was in concert with the others or that all the conspirators agreed before each act. *Int'l Bankers Life*, 368 S.W.2d at 582; *Paschal*, 215 S.W.3d at 453. Inferences of concert of action may be drawn from joint participation in the acts and from mutual enjoyment of the fruits of the acts. *Chu*, 249 S.Wd 3d at 447; *Int'l Bankers Life*, 368 S.W.2d at 582. ).

4.   The evidence of a conspiracy between ADT and Insight is not based on wild accusations or baseless speculation of Shawn Griffith. ADT claims that Greg Barnett, an employee of Insight, initiated the conspiracy with a telephone call [Doc. 68-1] that allegedly occurred on April 7, 2016, while the Security System Agreement ("the Agreement") was in full force and effect. The Agreement expressly provides Premier with exclusive rights within the PCR development:

> 6. <u>Exclusive Rights</u>:  During the term of this Agreement, PREMIER shall have the exclusive right to furnish monitoring services to the Residences through the Association. The foregoing notwithstanding, nothing contained herein shall prevent or prohibit a Member from installing a security system or subscribing for monitoring or maintenance services from any other person.

This Agreement is Joint Trial Exhibit # 1. *See* Joint Proposed Pretrial Order [Doc 73] at p. 9.

5.   The parties agree that the initial term of the Agreement expired as of July 18, 2016. *See* Joint Proposed Pretrial Order [Doc 73] at p. 5. The parties also agree that a notice of non-renewal was sent to Premier on April 21, 2016, which prevented the Agreement from automatically renewing; ending the Agreement as of July 18, 2016. *See* Joint Proposed Pretrial Order [Doc 73] at p. 5. Mr. Griffith is expected to testify that Bruce Crawford of Insight assured him that the notice was simply an attempt to renegotiate certain terms of the Agreement, told him to disregard it, and encouraged him to continue alarm activations for PCR Homeowners. With

those assurances, Premier continued to activate service for PCR Homeowners even after receipt of the notice. See [Doc. 69] at 7-8.

6. On April 11, 2016, ADT had presented a written proposal to PCR. This proposal is Joint Exhibit # 3. *See* Joint Proposed Pretrial Order **[**Doc 73] at p. 9. This proposal contains the following handwritten notation:



The logical inference is that ADT was aware of the Agreement and intended to use Premier's existing equipment in each PCR customer's home.

7. On May 6, 2016, ADT entered into an Alarm Monitoring Agreement. The ADT Alarm Monitoring Agreement is Joint Exhibit # 4. *See* Joint Proposed Pretrial Order [Doc 73] at p. 9. The ADT Alarm Monitoring Agreement provides:

> 3. **MONITORING.** ADT will provide Monitoring of existing monitored security systems in all Residences in the Development under the terms of this Agreement at a monthly monitoring fee ("Monitoring Fee") of $12.47 (plus tax) per Residence, which will be payable by Association monthly in advance. The Monitoring Fee for a minimum of 840 Residences will commence on July 1, 2016. The Monitoring Fee for additional Residences will commence on the first day of the

Thus, payment to ADT was to commence prior to the termination of the Agreement with Premier.

8. ADT created a brochure for PCR resident which includes a notice dated May 9, 2016, which includes the following statement:

> To receive monitoring from ADT, we will need to visit your home to reprogram your security system. At that time, we will install the new cellular communicator. We will test your existing system and connected devices to ensure that they are working properly. Please call us NOW at 800-878-7806 to schedule the programming and installation of your equipment. Installation will take approximately 3 hours. <u>We must program your system for monitoring by ADT before June 21. 2016 to avoid interruption of service</u>.

This brochure is Premier Trial Exhibit # P-8. *See* [Doc 66]. ADT does not object to this trial exhibit. *See* [Doc. 82].

9. On May 11, 2016, Greg Barnett of Insight sent a notice via email to PCR residents which contains the statement:

> In support of this e-mail, you will soon receive a mailer from ADT. Upon receipt of this e-mail or mailer, please respond by calling ADT's Community Association Team at 800-878-7806 as soon as possible to schedule the reprogramming of your system and installation of your cellular communicator at no charge to you. You must have your system programmed for monitoring by ADT before June 21, 2016 to ensure uninterrupted service.

This notice is Premier Trial Exhibit # P-9. *See* [Doc 66]. ADT does not object to this trial exhibit. *See* [Doc. 82].

10. Mr. Griffith is expected to testify that on May 11, 2016, Greg Barnett of Insight called him demanding that he give Mr. Barnett the lockout code in anticipation of the Association's change in service providers. The control panel, which ADT claims to have replaced on every job, stores key Premier information as well as key customer information. A lockout code protects that information from other security companies so that they can not "slam" or steal clients. It also protects the homeowner from someone accessing their user code and defeating the system. Someone with the lockout code could pretend to be with Premier and give the central station the account number and tell them not to dispatch or to disregard all alarms thereby defeating the system. Mr. Griffith had never had an occasion to discuss a lockout code

with anyone affiliated with Insight, the Association, the Developer, or Republic, but the existence and use of a lockout code is something well-known within the security industry. When Mr. Griffith initially refused**,** Mr. Barnett became very belligerent and began screaming at him and using foul language**.** He was so flustered by Mr. Crawford's aggressiveness that he ultimately gave them Premier's lockout code. *See* [Doc. 69] at 8.

11. Mr. Griffith will testify that he subsequently observed that Premier's cellular alarm transmission equipment had been removed from those homes, and ADT's equipment had been installed in its place. The cellular alarm dialers used by Premier have a sim card in it specifically authorized to Premier. With the sim card, the dialers provide a simulated dial tone for the alarm panel to transmit signals via a dedicated cellular line, rather than on a landline, to Premier's monitoring station. When a security company sells customer accounts to another company, it will reauthorize the other company to use that dedicated line, similar to when a person "releases" a cellular telephone number to another user. In the security industry, this along with remote call forwarding of the number programmed in the CPU is how a "line swing" is typically done. From a technical perspective, because there was no sale of accounts to ADT, it had to disconnect the cellular alarm dialers from the Homeowners' systems in order to redirect the alarm signal via ADT's dedicated cellular line to its monitoring station. *See* [Doc. 69] at 9.

12. Mr. Griffith will also testify that, while the control panels of the Premier's alarm systems had not been removed from those homes, the lockout codes had been reprogrammed. From a technical perspective, the simplest and easiest way to change the lockout code is by using the existing lockout code to program a new lockout code. In the security industry, this is the way a typical service technician changes a lockout code. There are technically feasible ways of changing the lockout code without knowing the existing code but doing so requires a much more

advanced level of knowledge and skill than the average technician has. Without the lockout code, ADT would have had to remove and replace the CPU or control panel that Premier had programmed on each individual Homeowner's system. *See* [Doc. 69] at 9-10.

13. Mr. Griffith will testify that the removal of Premier's equipment, installation of ADT's equipment, and changing of Premier's lockout code prevents Premier from providing the alarm monitoring, cellular alarm transmission, automation, remote access, fire protection and other services to Homeowners. From a technical perspective, these actions by ADT prevent Premier from performing services pursuant to the individual Security Monitoring Agreements with PCR Homeowners. Mr. Griffith has been identified as an expert witness in the home security and integration industry, and ADT does nortchallenge his qualifications and experience as an expert in this field. *See* [Doc. 69] at 10.

14. Mr. Griffith is further expected to testify that on May 13, 2016, he hired the undersigned attorney who sent letters to both Insight and ADT demanding that they stop interfering with Premier's contracts. Nevertheless, ADT persisted in removing Premier equipment from the residences, installing their own, and changing the lockout codes. From reports Premier receives from its monitoring station, Mr. Griffith watched as the number of accounts in PCR transmitting signals became smaller and smaller. *See* [Doc. 69] at 10.

15. On June 3, 2016, Mr. Griffith received a copy of another letter from Greg Barnett of Insight which states:

> To date, ADT has visited approximately 550 PCR homes and have made the monitoring transition and we encourage the remaining owners to check your schedules and have your monitoring transitioned to ADT as soon as possible so there is no interruption in service.

This letter is Premier Trial Exhibit # P-11 *See* [Doc 66]. ADT does not object to this trial exhibit. *See* [Doc. 82]. ADT had converted almost 550 Premier clients in roughly 20 business

days.  Mr. Griffith is expected to testify this would have been extremely unlikely, from a technical perspective without the lockout code.  Without the lockout code, it would have been necessary to have the control panels in stock, to remove the CPU or control panel that Premier had already installed and programmed, and to install a brand new one—wiring up each one and then program the entire system from factory default versus programming a couple of sections with the lockout code.  *See* [Doc. 69] at 9.

15.     The Agreement with Premier at PCR does not mention or contemplate the Association replacing Premier with another security provider.  Mr. Griffith will testify that, pursuant to the Agreement, the term of the Agreement automatically renewed for successive thirty-six-month renewal terms after the expiration of the initial term, unless terminated by the Association by written notice delivered sixty days prior to the commencement of any renewal term.  It was always contemplated that the Agreement would continue through build-out of the Development. This automatic renewal term ensured Premier that it would reach the represented volume of 2,300 homes justifying its deep discounts. See [Doc. 69] at 4.

16.     The Request for Proposal Premier received from Republic with respect to PCR specifically provides: "The equipment installed will be the same for each of the 2,300 homes in the community and the individual home collections will be handled by the Homeowner's Association. . .The penetration rate in the community is guaranteed at 100% of homes."  This Request for Proposal is Joint Trial Exhibit # 2.  *See* Joint Proposed Pretrial Order [Doc 73] at p. 9.

17.     Mr. Griffith will testify that he personally discussed the automatic renewal term with Tony Ruggeri of Republic.  Mr. Ruggeri indicated that during build-out of the Development, the Republic-affiliated Developer would maintain control over the Association

but, after build-out, the management and control of the Association would be turned over to the Homeowners. If the Homeowners ever decided to not renew the bulk-billing agreement for any reason, Tony Ruggeri represented, and Mr. Griffith agreed, that under the Agreement, Premier would still have 2,300 customer accounts. . *See* [Doc. 69] at 4.

18. With the Agreement itself not mentioning or contemplating a change of security provider, Insight and ADT acted together to orchestrate the events as described above in order to steal Premier's accounts with its PCR customers. In violation of the exclusivity provision of the Agreement, Insight contacted ADT to provide monitoring services to PCR residences before the term of the Agreement had expired. Both Insight and ADT lied to PCR homeowners that their home security alarm service would be interrupted unless they allowed ADT to enter their homes to reprogram their equipment before June 21, 2016. ADT's own Alarm Monitoring Agreement provided that it would be paid for 840 residence starting July 1, 2016—before the initial terms of Premier's Agreement with PCR ended. Far from wild accusations or baseless speculation of Shawn Griffith as ADT claims, there is a wealth of evidence in this case from which a natural inference arises that the unlawful overt acts were committed in furtherance of a common design, intention, or purpose of the conspirators.

## PRAYER

For the foregoing reasons, Premier requests that this Court deny ADT LLC's Motion in Limine to Exclude Unsupported Testimony regarding a Purported Conspiracy involving ADT [Doc. 68] in its entirety. Premier prays for general relief.

Respectfully submitted,

*/s/ John M. Frick*

_____

**John M. Frick**
Texas Bar No. 07455200
*jfrick@bennettweston.com*

**BENNETT, WESTON, LAJONE & TURNER, P.C.**
1603 LBJ Freeway, Suite 280
Dallas, Texas  75234
Tel:     (972) 662-4901
Fax:    (214) 393-4043

**ATTORNEY FOR PLAINTIFF
PREMIER ELECTRONICS, L.L.C.**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Plaintiff Premier's Response to ADT LLC's Motion in Limine to Exclude Unsupported Testimony regarding a Purported Conspiracy involving ADT has been furnished to the following counsel in accordance with the Federal Rules of Civil Procedure, this 22nd day of January 2021:

Eric S. Boos
SHOOK, HARDY & BACON, L.L.P.
Citigroup Center
201 S. Biscayne Blvd., Suite 3200
Miami, FL  33131-4332
esboos@gmail.com

Tanya L. Chaney
SHOOK, HARDY & BACON, L.L.P.
JPMorgan Chase Tower
600 Travis St., Ste. 3400
Houston, TX  77002-2926
tchaney@shb.com

Charles C. Eblen (*Pro Hac Vice*)
SHOOK, HARDY & BACON LLP
2555 Grand Boulevard
Kansas City, MO 64108
ceblen@shb.com

*/s/ John M. Frick*_____
John M. Frick