IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **PREMIER ELECTRONICS, LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:18-CV-2036-L** |
| | § | |
| **ADT, LLC,** | § | |
| | § | |
| Defendant.[1] | § | |

## MEMORANDUM OPINION AND ORDER

On April 7, 2023, the court, by its order (Doc. 167), *sua sponte* determined that reconsideration of Defendant's Motion for Summary Judgment ("Motion") (Doc. 24), was necessary to revolve issues of law before trial.[2] For the reasons herein discussed, the court determines that Defendant is entitled to summary judgment on all of Plaintiff's claims. Accordingly, the court **grants** Defendant's Motion for Summary Judgment (Doc. 24) and **dismisses with prejudice** Plaintiff's claims against Defendant for tortious interference with contractual relations, tortious interference with prospective relations, and civil conspiracy.

## I.      Factual and Procedural Background

Plaintiff Premier Electronics, LLC ("Premier" or "Plaintiff") filed this lawsuit against Defendant ADT, LLC ("ADT" or "Defendant") in the 298th Judicial District Court of Dallas County, Texas, for claims arising from a dispute over contracts to provide home security services

---

[1] Defendants Insight Association Management GP, Inc., and Insight Association Management LP were dismissed without prejudice on March 21, 2022, because Premier Electronics, LLC, failed to comply with Federal Rule of Civil Procedure 4(m). *See* Doc. 136.

[2] The Motion was previously denied in part and granted in part, granting summary judgment on the claims that Premier conceded in its Response, and leaving Plaintiff's claims for tortious interference with contractual relations, tortious interference with prospective relations, and civil conspiracy remaining for trial. *See* Doc. 56.

**Memorandum Opinion and Order – 1**

to planned residential communities. ADT timely removed this action to federal court on August 6, 2018, on the basis of diversity jurisdiction.

ADT has moved for summary judgment on all six of Premier's claims: (1) tortious interference with existing contracts with Phillips Creek Ranch ("PCR") Homeowners; (2) tortious interference with prospective relations with PCR Homeowners; (3) tortious interference with existing contract with the PCR Land Company, LLC ("Developer") and the PCR Community Association, Inc. ("Association"); (4) tortious interference with existing prospective relations with builders; (5) tortious interference with prospective relations with respect to the Walsh development; and (6) civil conspiracy. As the court herein explains, however, it determines that only claims remaining are Claim (1) for tortious interference with existing contracts with the PCR Homeowners; Claim (5) for tortious interference with prospective relations with respect to the Walsh development; and Claim (6) for civil conspiracy. The court's analysis, therefore, focuses on these issues. Unless otherwise indicated, the factual matters herein are undisputed.

This action stems from an agreement between Premier and a housing development association to provide residential security services. Premier is a security company in the business of installing, maintaining, and monitoring fire, burglary, and alarm systems in Texas. Pl.'s Summ. J. App. 3. The PCR master-planned residential community, located in Frisco, Texas, and, it, as well as the sister communities of Light Farm and Walsh, are developed and owned by Republic Property Group ("Republic"). *Id*. at 4, 22. On September 4, 2012, Premier entered into the Security System Agreement (the "Security System Agreement") with the Association and Developer to provide basic home security alarm monitoring services in bulk to the homeowners in the PCR community. *Id*. The basic alarm services operate by sending security sensor signals to a Premier control panel located within the residence, which then communicates those signals over a

telephone land-line, to a central monitoring stations staffed by live personnel. Def.'s Summ. J. App. 195. The alarm signals can also be communicated to the central monitoring station by cellular transmission. *Id*. at 196.

Under the Security System Agreement, Premier installed its security systems into all residences within the PCR community and provided "all monitoring services as described in this Section 3 for each Residence with an installed System during the term of this Security System Agreement unless the owner of the Residence affirmatively waives the right to receive and refuse Monitoring Services." *Id*. at 6. The residential alarm services provided to the PCR Homeowners were billed to and paid by the Association. *Id*. at 7.

The Security System Agreement began upon the activation of the first Premier residential system in the PCR development and continued for an initial term of thirty-six months beginning after the tenth residential system activation. *Id*. The Security System Agreement "shall be automatically renewed for successive thirty-six month renewal terms after the expiration of the initial term, unless terminated by the Association with[in] sixty (60) days written notice prior to the commencement of any renewal period." *Id*. The tenth residential system activation occurred on July 18, 2013, and thus the initial term of thirty-six months expired on July 18, 2016. Pl.'s Summ. J. App. 7. The Security System Agreement's modification clause provides that "[n]o interpretation, change, termination, waiver of extension of time for performance under any provision of this Agreement shall be binding on any party unless in writing and signed by the party intended to be bound thereby." Def.'s Summ. J. App. 13.

As part of the Security System Agreement, individual PCR Homeowners could also contract individually with Premier to add additional services such as cellular-signal transmission and fire monitoring services, at an additional cost billed directly to them. *Id*. at 19. The Security

System Agreement described these individual PCR Homeowner contracts ("Individual Homeowner Agreement") as:

> Homeowner Agreement: As a condition to initiating the services described in Sections 2 and 3 [cellular transmission and fire monitoring services] of this Agreement with respect to any Included Residence, PREMIER shall require the owner of such Included Residence, to execute a Residential Central Alarm Monitoring Agreement in substantially the same form as that attached hereto as Exhibit "D".

*Id*. at 13. The Security System Agreement provides that "[a]ll Exhibits hereto are expressly made a part of this Agreement as fully as though completely set forth herein, and all references to this Agreement, herein, in any such Exhibits or elsewhere, shall be deemed to refer to and include all such Exhibits." *Id*.

Exhibit D provides: "Scope of Services: PREMIER shall provide monitoring and maintenance services of the System in accordance with the terms of the Security System Agreement originally entered into by PREMIER and the Association . . . ." *Id*. Exhibit D continues that the additional services Premier provided to the Homeowners "at Homeowner's request which are in addition to those described in the Association Agreement shall be the sole responsibility of Homeowner." *Id*. Finally, Exhibit D states that "(a) [t]his Agreement constitutes the entire Security System Agreement between Premier and Homeowner with respect to monitoring and maintenance services by Premier of the Monitored Premises and may not be amended, modified, or altered in any manner except in a writing signed by all parties." *Id*. at 21. There is no term of duration in Exhibit D. *See Id*. at 19-21.

Drawing from the authority in the Security System Agreement and Exhibit D, Premier then drafted the Individual Homeowner Agreements as separate contracts with PCR Homeowners. Pl.'s Summ. J. App. 13. The Individual Homeowner Agreement sets forth the scope of services as "PREMIER shall provide monitoring and maintenance service of the system in accordance with

the terms of the Agreement originally entered into by PREMIER and the Association." Def.'s Summ. J. App. 204. The Individual Homeowner Agreement then details that the Homeowner receives the basic monitoring services at no additional charge as all fees for services provided under the Security System Agreement are paid by the Association. *Id*. The Individual Homeowner Agreement then offers "Additional Monthly Services Provided to Homeowner," including Cellular/Signal Transmission, Fire, and Warranty, to be paid by the Homeowner. *Id*. On the second page, after the signature on page one, the Individual Homeowner Agreement provides that:

> (e) Additional services initial term shall be five (5) years starting on the first day of the month during which the Equipment is installed and connected by Premier or its contractor(s). The agreement will automatically continue for successive one year renewal terms unless Customer [PCR Homeowner] or Premier gives written notice of cancellation at least 60 days before the initial or renewal term ends.

*Id*. at 205. Premier executed 386 Individual Homeowner Agreements with the PCR Homeowners and provided services under both the Security System Agreement and Individual Homeowner Agreements during the PCR community buildout. Pl.'s Summ. J. App. 13.

Nearing the end of the Security System Agreement's thirty-six month term, the Association exercised its right to terminate it by sending Premier written notice on April 21, 2016. Def.'s Summ. J. App. 40. The Association then solicited and, after receiving a quote, selected ADT as the new bulk security provider and executed a new bulk security provider contract on May 6, 2016, to provide security alarm monitoring services as well as cellular transmission services to the entire PCR community. *Id*. at 221–228. To switch over the PCR Homeowners' individual residential systems from Premier's monitoring services, ADT communicated to the PCR Homeowners, through the Association:

> To receive monitoring from ADT, we will need to visit your home to reprogram your security system. At that time, we will install the new cellular communicator. We will test your existing system and connected devices to ensure that they are working properly. Please call us NOW at [telephone number] to schedule the

programming and installation of your equipment. Installation will take approximately 3 hours. **We must program your system for monitoring by ADT before June 21, 2016 to avoid interruption of service.**

Pl.'s Summ. J. App. 34 (emphasis in original). Soon after, a similar communication was sent to the PCR residents from Mr. Greg Barnett, the PCR Community Manager, in which residents again were told to schedule a service appointment with ADT, adding that reprogramming by ADT no later than June 21, 2016, was necessary to ensure uninterrupted services. *Id.* at 32-33. Beginning in late May 2016, ADT began to send its technicians to PCR residences to reprogram equipment installed by Premier or install new ADT equipment. Def.'s Summ. J. App. 197.

Premier argues that the statement made by ADT and the Association requiring reprogramming of the residential home alarm systems is undisputedly false. Pl.'s Summ. J. Br. 16. It contends that the PCR Homeowners had the option of continuing services with Premier, transitioning services to ADT, or contacting a third-party provider, and that "until a customer gave timely, written notice of cancellation of that particular" Individual Homeowner Agreement, "Premier would have continued to provide service." *Id.* ADT argues that "at no point did ADT communicate to the Phillips Creek Ranch homeowners that they were required to terminate their existing services with Premier . . . ." Def.'s Summ. J. App. 197.

Premier asserts that in sending the letter to the PCR Homeowners, ADT tortiously interfered with Premier's existing contractual relationship with the PCR Homeowners. Pl.'s Summ. J. Br. 28. Further, Premier contends that ADT conspired with Mr. Barnett and Insight (the day-to-day management company contracted by the PCR Association) to wrongfully divert the planned contract for the Walsh development away from Premier. *Id.* Premier seeks actual and exemplary damages for its claims.

This case was first set for trial before United States District Judge Ada Brown in 2021 before her recusal and the reassignment of the case to the undersigned. This court then set this case for trial first in February 2022, and then, after counsel's conflict with a state trial, the court reset it for trial on April 3, 2023, and for a pretrial conference on March 30, 2023. In that conference, the court concluded that the case presented unresolved issues of law and *sua sponte* determined that ADT's Motion must be reconsidered as the claims it addressed require interpretation of a contract, which is a question of law. *See Ironshore Specialty Ins. Co. v. Aspen Underwriting, Ltd.*, 788 F.3d 456, 459 (5th Cir. 2015). Here, Texas contract law applies, as the contractual relationships were formed in Texas, and thus this court must apply that law "as interpreted by the state's highest court." *American Int'l Specialty Lines Ins. Co. v. Rentech Steel, LLC*, 620 F.3d 558, 564 (5th Cir. 2010).

## II.     Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are

"irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id*. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

### III.    Discussion and Analysis

In its Motion, ADT requests the court grant summary judgment in its favor on all six of Premier's claims and request for exemplary damages. ADT argues that there are no genuine disputes of material fact as to these claims, and it is therefore entitled to summary judgment as a matter of law.

In Response, Premier asserts that there remain genuine disputes of material fact on Counts 1, 5, and 6, and its request for exemplary damages. Premier concedes that, based upon factual development during the course of discovery, it no longer wishes to pursue its claims related to the Security System Agreement with the Association and Developer. Further, Premier did not address in its Response ADT's arguments against exemplary damages, and therefore the court determines that Premier abandoned that claim, too. *See Vela v. City of Houston*, 276 F.3d 659, 678–79 (5th Cir. 2001) (finding that a plaintiff abandoned the claims that it failed to address at summary judgment); *see also Black v. North Panola Sch. Dist.*, 461 F.3d 584, 588 (5th Cir. 2006) (holding that a plaintiff's failure to pursue a claim beyond the complaint constitutes abandonment). Accordingly, the court **dismisses with prejudice** Premier's claims for tortious interference with prospective relations with PCR Homeowners; tortious interference with existing contract with the Developer and the Association; tortious interference with existing prospective relations with builders; and exemplary damages.[3]

---

[3] Further, even if the court were to consider Plaintiff's abandoned request for exemplary damages, the request would fail on the merits, as Plaintiff does not prevail on any claim.

With those claims resolved, the court considers Defendant's request for summary judgment as to Premier's claims for: (A) tortious interference with existing contracts with the PCR Homeowners; (B) tortious interference with prospective relations with Walsh; and (C) civil conspiracy. The court now addresses in turn each claim.

## A. Tortious Interference with Existing Contracts with PCR Homeowners

ADT argues that Premier cannot prove or raise a genuine dispute of a material fact for tortious interference with the PCR Homeowners' existing contracts because, at the time that ADT committed the alleged interference, Premier no longer had existing contracts with the Homeowners. Def.'s Summ. J. Br. 7. To support this argument, ADT asserts that: (1) the Individual Homeowner Agreement was incorporated into the bulk-billing Security System Agreement, including the duration term, and thus termination of the Security System Agreement automatically terminated the Individual Homeowner Agreements; (2) the independent five-year duration term in the Individual Homeowner Agreements was not properly part of that contract because it was on a second page and underneath the homeowner's signature; and (3) Premier has not suffered any damages because the Individual Homeowner Agreements automatically terminated and the Association satisfied its contractual financial obligations.

In Response, Premier argues that the Individual Homeowner Agreements' five-year duration controls that contractual relation as a separate agreement between it and the PCR Homeowners. Pl.'s Summ. J. Br. 22. It argues that the Security System Agreement termination did not automatically terminate the Individual Homeowner Agreements because the Security System Agreement does not state what happens to those contracts if it is terminated, and vice versa. *Id.* It asserts that the Individual Homeowner Agreements' duration term is a separate term and therefore separately binding on the PCR Homeowners, thus severing any automatic termination that would

flow from the proper termination of the Security System Agreement. *Id*. at 22-23. Finally, Premier argues that if the court adopts ADT's automatic-termination interpretation argument, it will lead to absurd results such as short Individual Homeowner Agreements duration and the abrupt cancellation of all those contracts in one action. *Id*. at 24.

    1.  <u>Applicable Law</u>

      To prove tortious interference with an existing business relationship or raise a genuine dispute of material fact, a plaintiff must establish that "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Nix v. Major League Baseball*, 62 F.4th 920, 934 (5th Cir. 2023) (citing *Prudential Ins. Co. of Am. v. Financial Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000)). To show an "act of interference," a plaintiff must demonstrate that the defendant "knowingly induced one of the contracting parties to breach its obligations under a contract." *Id*. (citing *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied)). The first requirement for the court to consider is whether there is an existing contract with which a defendant could interfere. *See id*.

      Under Texas contract law, "an unsigned paper may be incorporated by reference" in a signed contract. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004). The incorporated document becomes part of the contract, and "both instruments must be read and construed together." *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 189 (Tex. App.—Dallas, 2013, no pet.). The language in the primary document must show that the parties intended for the other document to become part of the agreement. *See One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 267 (5th Cir. 2011) (holding that to uphold the validity of terms incorporated by reference, it must be "clear that the parties to the agreement had

knowledge of and assented to the incorporated terms") (citing 11 Samuel Williston & Richard A. Lord, A TREATISE ON THE LAW OF CONTRACTS § 30:25 (4th ed. 1999)).

A court considers whether a contract, including any incorporated documents, includes essential terms such that the court can understand what the parties undertook. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). If a contract is missing an essential term, a court may imply a term that can be done so reasonably. *1320/1390 Don Haskins, Ltd. v. Xerox Com. Sols., LLC*, 584 S.W.3d 53, 70-71 (Tex. App.—El Paso 2018, pet. denied) (citing *Fischer*, 479 S.W.3d at 239). Duration is an essential term for a contract for services. *Jubilee Acad. Ctr., Inc. v. School Model Support, LLC*, No. 04-21-00237-CV, 2022 WL 1479039, at *5 (Tex. App.—San Antonio May 11, 2022, pet. denied) (evaluating an ancillary agreement for services when the agreement was set forth in an exhibit to the underlying contract). A reasonable term with regard to a term for the duration of a contract is to be "determined by the circumstances of the parties and the subject matter of the contract." *1320/1390 Don Haskins, Ltd.*, 584 S.W.3d at 70; *see also Heritage Res., Inc. v. Anschutz Corp.*, 689 S.W.2d 952, 955 (Tex. App.—El Paso 1985, writ ref'd n.r.e.) ("What is a reasonable time depends upon the facts and circumstances as they existed at the date of the contract."). "If a reasonable time is implied, the determination of what is a reasonable time is generally a question of fact unless the evidence is uncontroverted." *1320/1390 Don Haskins, Ltd.*, 584 S.W.3d at 71. "A contract is not ambiguous nor too indefinite to be enforced in regards to its duration so long as the language used fixes an ascertainable fact or event by which the term of the duration of the contract can be determined." *King v. Baylor Univ.*, 46 F.4th 344, 358 (5th Cir. 2022) (quoting *Brittian v. General Tel. Co.*, 533 S.W.2d 886, 891 (Tex. App.—Fort Worth 1976, writ dism'd)). A court may also consider the practical effects of the

implied term and favor a utilitarian standpoint bearing in mind the business activity sought to be served. *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996).

Finally, "[a] modification of a contract must satisfy the elements of a contract: a meeting of the minds supported by consideration." *Williams v. Colthurst*, 253 S.W.3d 353, 359 (Tex. App. 2008) (citing *Hathaway v. General Mills, Inc.,* 711 S.W.2d 227, 228 (Tex. 1986)). To determine whether a contract was modified, a court considers the parties' intentions and the factual circumstances. *Id*. "The burden of proving modification rests on the party asserting the modification." *Id*.

2.   The Parties' Arguments

ADT argues that Premier's claim fails on the first element because there was not an existing contract with the PCR Homeowners that could be subject to interference. Def.'s Summ. J. Br. 24. ADT argues that because the Association validly terminated the Security System Agreement, the Individual Homeowners Agreements automatically terminated as a matter of law, as "the terms of Premier's contract for bulk monitoring were expressly incorporated into various individual agreements for ancillary services that Premier entered into with the PCR Homeowners, linking the duration of these individual agreements with that of the Association's master contract." *Id*. at 7. ADT contends that Exhibit D is incorporated by reference into the Security System Agreement, as agreed to by Mr. Griffeth, Premier's president and CEO. Def.'s Summ. J. App. 136

ADT also asserts that the incorporation of Exhibit D as the template for the Individual Homeowner Agreement is necessary and logical because "the ancillary services provided by Premier to the PCR Homeowners depended on the alarm monitoring services in the [Security System] Agreement." Def.'s Summ. J. Br. 19. The extra services—such as the cellular signal transmission—required that a Homeowner's control panel be connected to a monitoring station

operated by Premier. *Id*. at 20. Absent the connection to Premier's central monitoring station, "any cellular transmitter installed by Premier would have become useless after Premier was replaced" as the bulk alarm services provider. *Id*.

ADT further argues that because Exhibit D does not contain a term of duration, the Security System Agreement's duration term should have been the term included in the Individual Homeowner Agreements. *Id*. It contends that Premier "went rogue," and materially changed the terms in the Individual Homeowner Agreements from those that the parties agreed to in Exhibit D by adding a five-year contract duration. *Id*. at 21. Because the Individual Homeowner Agreements' term of duration was not agreed to by the parties, ADT contends that it is not a binding term. *Id*. at 22-23. Therefore, ADT argues that the Security System Agreement's term controls, and thus automatic termination triggers from the termination of the Security System Agreement. *Id*. at 23. Therefore, ADT contends that when the Security System Agreement terminated on July 18, 2016, the Individual Homeowner Agreements also terminated, and thus Premier had no existing contracts with any PCR Homeowners.[4] *Id*. at 24.

Premier disagrees, asserting that the Security System Agreement "mentions nothing about what happens to the [Individual Homeowner Agreements] if the Association ever decided not to renew." Pl.'s Summ. J. Br. 22. Premier further contends that the contract was intended to last through the buildout of the PCR development, which would be complete when the five-year Individual Homeowner Agreements began to phase out, at which time the Individual Homeowners Agreements would renew for "successive one year renewal terms." *Id*. at 24.

---

[4] ADT offers additional arguments against this claim, including that Premier has not suffered any damages even if ADT interfered; that any alleged interference is not independently tortious because Premier has not presented any evidence that ADT committed a separate tortious act; and that if ADT tortiously interfered, its actions were justified in furtherance of its contractual obligations to the Association. *See* Def.'s Summ. J. Br. 17, 24,

**Memorandum Opinion and Order – 14**

Premier argues that if the court adopts ADT's proposed interpretation, it would lead to an absurd result because, as Homeowners signed contracts at various times throughout the underlying Security System Agreement term, a Homeowner could possibly sign a contract immediately prior to the Association's termination of the Security System Agreement, thereby giving the last PCR Homeowner a one-day agreement. *Id*. Premier further asserts that this interpretation would lead to the abrupt cancellation of all Homeowner services for "all 917 PCR customers in one day." *Id*. Premier contends that "[i]t is far more logical that Premier and each individual Homeowner would have the right to cancel service on a rolling basis as the initial or renewal term of each [Individual Homeowner Agreement] ended." *Id*. at 24-25.

3. <u>Analysis</u>

The court agrees with ADT's argument that the Individual Homeowner Agreements automatically terminated when the underlying Security System Agreement terminated because its duration term controls the Individual Homeowner Agreements, not the modified five-year term added by Premier. First, the Individual Homeowner Agreements are ancillary to the Security System Agreement. The Individual Homeowner Agreements are for services—like the cellular transmission service—that are ancillary to the underlying security monitoring services in the Security System Agreement. Further, the Individual Homeowner Agreement makes direct reference to the Security System Agreement as the primary agreement that directs the scope of Premier's services for the individual Homeowners. Section 1 of the Individual Homeowner Agreement provides that the scope of services is that "PREMIER shall provide monitoring and maintenance service of the system in accordance with the terms of the Agreement originally entered into by PREMIER and the Association." Def.'s Summ. J. App. 204.

The Individual Homeowner Agreement then offers "Additional Monthly Services Provided to Homeowner," including Cellular/Signal Transmission, Fire, and Warranty, to be paid by the Homeowner. *Id*. Because the Individual Homeowner Agreements makes clear reference to the Security System Agreement as the underlying agreement that governs the primary alarm services, the court **determines** that the Individual Homeowner Agreements are ancillary to the Security System Agreement. The Individual Homeowner Agreements are therefore not independent contracts for services between PCR Homeowners and Premier, and, as the ancillary agreement, the Individual Homeowner Agreements are controlled by the Security System Agreement's terms.

The Security System Agreement required that Premier execute the Individual Homeowner Agreements "in substantially the same form as that attached hereto as Exhibit 'D'", which ADT and Mr. Griffeth agree is incorporated into the Security System Agreement. *Id*. at 12-13. Premier was contractually obligated to create the Individual Homeowner Agreements to be "substantially similar" to Exhibit D of the Security System Agreement.

Premier, however, did not follow this requirement. Although Exhibit D does not contain an independent term of duration, Premier added one anyway. It modified the Individual Homeowner Agreements to include a duration of five years that is not found in either the Security System Agreement or Exhibit D. Because the five-year term was not included in those controlling documents, and was not agreed to in writing by both Premier and the Association as required by the Security System Agreement's modification clause, it is an unagreed-to term. Accordingly, the court determines that, based on the uncontroverted evidence supporting the incorporation of Exhibit D and its control on the terms of the Individual Homeowner Agreements, it must interpret that contract without the added five-year term of duration. *See 1320/1390 Don Haskins, Ltd.*, 584

S.W.3d at 71. Thus, the Individual Homeowner Agreement does not have a term of duration independent from the Security System Agreement.

Without the five-year term of duration, the Individual Homeowner Agreement is now missing this essential term for a services contract. The court, then, "may imply a term that can be done so reasonably." *See id.* at 70-71. The reasonable duration term is that found in the underlying contract, the Security System Agreement. Therefore, the court determines that the Individual Homeowner Agreements terminated when the Association properly terminated the Security System Agreement on July 18, 2016.

Further support for the court's interpretation is the "practical effects of the implied term and . . . the business activity sought to be served." *Lenape Res. Corp.*, 925 S.W.2d at 574. The Security System Agreement created the base alarm monitoring service, and the Individual Homeowner Agreements contracted for additional services that relied on the base service; Premier required control of the underlying monitoring system to perform the additional monitoring services for the PCR Homeowners. *See id.* (holding that courts should construe a contract bearing in mind the business activity sought to be served).

Premier, however, has not sufficiently addressed how the Individual Homeowner Agreements could be independent contracts for ancillary services when those services require the basic alarm monitoring service provided by the Security System Agreement. In other words, the contracts for extra services have no independent use than to add to the existing basic monitoring service contract with the Association. Thus, it is reasonable to conclude that the Individual Homeowner Agreements were intended by the parties to operate for the duration of the Security System Agreement. For these reasons, the court concludes that at the time that ADT sent the letter to the PCR Homeowners, the Association had already given notice of non-renewal to Premier and

thus, there was no contract with which ADT could interfere. Premier failed to raise a genuine dispute of material fact and presented no competent evidence in support of the first element of its claim. Accordingly, the court **determines** that Defendant is entitled to judgment as a matter of law on Premier's claim for tortious interference with existing contractual relations with the PCR Homeowners, and **grants** Defendant's Motion as to this claim. As the court has already determined that the Premier has failed to raise a genuine dispute of material fact as to this claim, it need not consider ADT's other arguments and affirmative defense, or Premier's responses to those arguments.

### B.  Tortious Interference with Prospective Relations with Respect to Walsh

Addressing Premier's second remaining claim, ADT argues that Premier has not presented any competent summary judgment evidence to support its claim for tortious interference with prospective relations with respect to the Walsh development. ADT contends that Premier asserts the claim solely on conjecture and subjective belief. Def.'s Summ. J. Br. 8.

On the same day that ADT filed its Reply Brief, it also filed a Motion to Strike certain portions of Premier's summary judgment evidence related to this claim.[5] The court, however, need not address the majority of ADT's arguments made in the Motion to Strike because, for the reasons herein stated, it agrees with ADT's Reply Brief argument that Premier has failed to present any competent summary judgment evidence to support this claim, and, accordingly, ADT is entitled to judgment as a matter of law on this claim.

### 1.  Applicable Law

To prove a claim for tortious interference with a prospective business relation or raise a genuine dispute of material fact, a plaintiff must establish that:

---

[5] Premier did not respond to ADT's Motion to Strike.

> (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.

*Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) (citing *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001)).

    2.  <u>Discussion and Analysis</u>

    In its Motion, ADT asserts that the only evidence that Premier offers to support this claim amounts to speculation and hearsay statements. Premier rebuts this argument by asserting that the offered "evidence raises an inference that ADT's actions interfered with Walsh" because Republic had previously discussed continuing to work with Premier as the bulk security provider for all of its planned communities, including Walsh, but after ADT received the contract for PCR, Republic representatives "would no longer meet with Griffeth concerning Walsh." Pl.'s Summ. J. Br. 29. Because Premier and Republic already had written agreements for bulk security services for both the PCR and Light Farms communities, Premier argues that the contract for the same services with the Walsh community was reasonably probable. *Id.*

    As its sole evidence in support of this claim, Premier offers the statements in Mr. Griffeth's Declaration. *See* Pl.'s Summ. J. App. 4-5, 19, 20, 22. Mr. Griffeth states that, due to Premier's business relationship with Republic prior to the termination of the Security System Agreement, he "certainly perceived that there was a reasonable probability that Premier would have entered into a business relationship with the Republic-affiliated developer and homeowners' association for the Walsh development under similar terms and conditions." *Id.* at 19. Premier points to the conversations between Mr. Griffeth and Republic representatives in which Mr. Griffeth understood

that Republic intended to extend—not end—its existing business relationship with Premier. Pl.'s Summ. J. Br. 29-30. Mr. Griffeth attested that, "[b]ased upon Republic's representations to [him], [Mr. Griffeth and Republic representatives] both expressly contemplated that a third agreement would be entered into concerning a third planning development known as Walsh." Pl.'s Summ. J. App. 19. ADT argues that these statements must be struck as inadmissible hearsay, and the court agrees.

Proffered evidence in a summary judgment motion need not be in admissible form, but its content must be admissible. *See Celotex Corp.*, 477 U.S. at 324. Under the Federal Rules of Evidence, hearsay is defined in part as any statement "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Unless subject to an exception, hearsay is not admissible. Fed. R. Evid. 802. Mr. Griffeth's statements of what he discussed with Republic representatives regarding the plans for the Walsh bulk-billing agreement are hearsay, as they are offered for the truth of the matter asserted to show that, prior to the termination of the Security System Agreement, Republic intended to contract with Premier to provide security services to the Walsh community. Rules 803 and 804 set forth exceptions that make statements subject to the hearsay rule admissible, but none of these exceptions applies here. Rule 807, the "Residual Exception," provides that, even if not admissible under Rules 803 or 804, this exception to the hearsay rule applies, upon reasonable notice to the opposing party, if:

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and
>
> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a)(1)-(2).

Given that Mr. Griffeth's central role as the president and CEO of Premier, the plaintiff in this action, he cannot be considered a neutral witness with nothing to gain from the outcome of this litigation. Accordingly, considering the totality of the circumstances, his hearsay statements are not supported by sufficient guarantees of trustworthiness, and thus are not excepted from the hearsay rule under Rule 807. The court, therefore, **sustains** ADT's objections to the hearsay statements in Mr. Griffeth's Declaration and does not consider them in ruling on the Motion. As such, these statements in the Griffeth Declaration are not competent summary judgment evidence to support Premier's claim for tortious interference with prospective business relations. *See Forsyth*, 19 F.3d at 1533.

Moreover, even if the court were to accept Mr. Griffeth's hearsay statements as evidence, the statements are inadequate support for Premier's claim. The discussions described by Mr. Griffeth were made while Premier provided the bulk security services to the PCR community. When the Association properly terminated the Security System Agreement and solicited a new contractual relationship with ADT, it reasonably follows that Republic would then use ADT for its other planned communities, as it intended to use one provider. Rather than support Premier's claim, the statements are evidence that Republic, in choosing ADT for its bulk-billing agreement with the Walsh community, acted as it had intended to from the beginning of its negotiations with Premier. Thus, even if taken as true, these statements do not "raise an inference of tortious interference" by ADT, as Premier asks the court to conclude.

As these statements are the sole evidence Premier offers to support this claim, and because Premier bears the burden of proof at trial, the court determines that Premier has failed to offer competent summary judgment evidence to raise a genuine dispute of material fact as to its claim for tortious interference with prospective business relations with respect to Walsh. Accordingly,

ADT is entitled to summary judgment on this claim, and the court **grants** the Motion as to this claim.

### C.  Civil Conspiracy

Texas courts consider civil conspiracy claims as a derivative tort, meaning it is "connected to the underlying tort and survives or fails alongside it." *Agar Corp., Inc. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136, 140-41 (Tex. 2019) (citing *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 148 (Tex. 1999)). Civil conspiracy is derivative because the injury arises not from the breached agreement but from the plaintiff's injury "resulting from another act done pursuant to the common purpose that gives rise to the cause of action." *Id*. (cleaned up). Civil conspiracy relies entirely on the fact of an injury caused by the underlying wrong. *Id*. The Fifth Circuit applies this standard to require that a plaintiff must, in addition to proving the underlying tort, prove conspiracy by showing:

> (1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) damages occur as a proximate result.

*WickFire, L.L.C. v. Laura Woodruff; TriMax Media, L.L.C.*, 989 F.3d 343, 358 (5th Cir. 2021), as revised (Mar. 2, 2021) (quoting *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017)). In sum, a claim for civil conspiracy is an underlying tort such that first, a plaintiff must establish the alleged tortious action.

Here, the court has determined that Premier's claims for tortious interference with the PCR Individual Homeowner Agreements and with the prospective business relations with Walsh must be dismissed as a matter of law. Thus, Premier has not presented competent summary judgment evidence or raised a genuine dispute of material fact related to an underlying tort upon which to

rest its claim for civil conspiracy. In light of the determinations herein made, the court **grants** Defendant's Motion and **dismisses with prejudice** Premier's claim for civil conspiracy.

**V.       Conclusion**

For the reasons herein set forth, Premier failed to raise a genuine dispute of material fact as to any of its claims, and presented no competent evidence to establish a claim for tortious interference with contractual relations, tortious interference with prospective business relations, and civil conspiracy. Accordingly, the court **determines** that ADT is entitled to judgment as a matter of law on Premier's claims, and **grants** Defendant's Motion for Summary Judgment (Doc. 23). As Premier has failed to raise a genuine dispute of material fact as to its claims, they are hereby **dismissed with prejudice**. Judgment will issue by separate document as required by Federal Rule of Civil Procedure 58.

**It is so ordered** this 12th day of June, 2023.

_Sam A. Lindsay_
Sam A. Lindsay
United States District Judge